UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------X

FAINA VINOKUR,

        Plaintiff,                **MEMORANDUM & ORDER**

  - against –                  07-CV-2893 (KAM) (MDG)

SOVEREIGN BANK,

        Defendant.

-------------------------------------X

MATSUMOTO, United States District Judge:

      Presently before the court is defendant Sovereign

Bank's ("defendant" or "Sovereign") motion for summary judgment,

pursuant to Federal Rule of Civil Procedure 56, seeking

dismissal of plaintiff Faina Vinokur's ("plaintiff" or

"Vinokur") action.  In this action, plaintiff alleges employment

discrimination in violation of New York State Executive Law

("NYSEL") § 296 and New York City Human Rights Law ("NYCHRL"),

Administrative Code § 8-107.[1]  Plaintiff alleges that defendant

---

[1] This action was originally commenced on June 20, 2007 in the
Supreme Court of the State of New York, Kings County.  The
action was subsequently removed to this court by defendant
pursuant to 28 U.S.C. §§ 1441 and 1446.  The parties do not
dispute that this court has subject matter jurisdiction over
this action based on diversity of citizenship, 28 U.S.C. § 1332
and 12 U.S.C. § 1464(x).  (See Doc. No. 1, Notice of Removal.)
Title 12 U.S.C. § 1464(x) provides that "[i]n determining
whether a Federal court has diversity jurisdiction over a case
in which a Federal savings association is a party, the Federal
savings association shall be considered to be a citizen only of
the State in which such savings association has its home
office."  12 U.S.C. § 1464(x).  It is uncontested that plaintiff
is a resident of Kings County, New York (see Doc. No. 1,
Complaint ("Compl.") ¶ 6) and that defendant is a "federal

discriminated against her on the basis of disability (rheumatoid arthritis), age (born 1954), and national origin (Russian). Further, plaintiff alleges that defendant failed to reasonably accommodate her disability and terminated her in retaliation for seeking an accommodation. (Doc. No. 1, Compl. ¶¶ 35-38.) For the reasons set forth herein, defendant's motion for summary judgment is granted in its entirety.

## BACKGROUND

The following facts, taken from the parties' statements pursuant to Local Civil Rule 56.1, are undisputed unless otherwise indicated. The court has considered whether the parties have proffered admissible evidence in support of their positions and has viewed the facts in the light most favorable to the nonmoving plaintiff.

**A. Plaintiff's Employment at
   Independence Community Bank**

Plaintiff was born in Russia in 1954. (Doc. No. 12, Defendant's Local Civil Rule 56.1 Statement ("Def. 56.1 Stmt.") ¶ 4.) In 1998, plaintiff commenced employment with Independence Community Bank ("Independence") as a teller at Independence's Avenue J, Brooklyn community banking office (the "CBO" or "branch"). (*Id.* ¶ 16.) She was hired by then Branch Manager

---

saving association" that maintains its "home office" in Pennsylvania (*see* Notice of Removal ¶ 4).

Carolina Scalici and was supervised by then Branch Assistant
Manager Karyn Baldassarre.[2] (*Id.* ¶¶ 16-17.)

In or around 1999, plaintiff was diagnosed with
rheumatoid arthritis. (*Id.* ¶ 21.) Between 1999 and 2006,
plaintiff was granted approximately five leaves of absence from
work due to her medical condition. (*Id.* ¶ 22.) One each
occasion, plaintiff submitted a doctor's note explaining the
reason for her absence. (*Id.*) Although plaintiff acknowledges
that no bank employee ever made any negative comment regarding
her medical condition (*id.* ¶ 23), plaintiff generally contends
that she was given "a problem when she needed time off for her
medical condition" but does not specify how or by whom (Doc. No.
14, Plaintiff's Local Civil Rule 56.1 Counterstatement ("Pl.
56.1 Stmt.") ¶ 23). Plaintiff claims that her medical condition
"frustrated her manager to the point [sic] manager would be mad
at her." (*Id.* ¶ 24.)

Plaintiff does not believe that her medically-excused
leaves of absence affected her employment in any manner. (Def.
56.1 Stmt. ¶ 25.) Indeed, in or around 2004, plaintiff was
selected by Ms. Scalici and Ms. Baldassarre for training as Head
Teller. (*Id.*) That position was "one of greater responsibility
than a teller." (*Id.*) After plaintiff received training for

---

[2] In August 2006, Ms. Scalici was promoted to Area Manager and
Ms. Baldassarre was promoted to Branch Manager. (Def. 56.1
Stmt. ¶ 29.)

that position, plaintiff declined the offer to become the permanent Head Teller because she could not lift heavy boxes. (*Id.* ¶ 27.) Although Ms. Scalici offered to lift any boxes for plaintiff, plaintiff nevertheless declined the promotion. (*Id.*) Plaintiff regularly acted as "back-up" Head Teller and was one of two tellers granted authority to exercise "overrides of teller transactions requiring supervisory approval." (*See id.* ¶¶ 27-28.)

### B. Sovereign Bank and its Policies

In or around June 2006, Independence Bank was acquired by the parent company of Sovereign Bank. (Def. 56.1 Stmt. ¶ 2.) In September 2006, Independence employees were converted to Sovereign employees and became subject to Sovereign's employment policies. (*Id.*) On August 18, 2006, plaintiff acknowledged, in writing, that she read and became familiar with Sovereign's policies, including its equal employment opportunity policy, which prohibits discrimination and sets forth a complaint procedure. (*Id.* ¶¶ 5, 9-10.)

Among other things, the training materials reviewed by plaintiff set forth Sovereign's policies and procedures regarding its mandatory compliance with the Bank Secrecy Act of 1970 (the "BSA"). (*Id.* ¶ 11.) The training materials advised Sovereign employees that the purpose of the BSA is "to monitor and report certain types of transactions . . . to aid law

enforcement authorities and the Internal Revenue Service in uncovering a multitude of criminal activities." (*Id.*) Sovereign's employees were informed that failure to comply with BSA reporting requirements may expose Sovereign, its directors, officers and employees to civil and criminal penalties. (*See id.*)

The training materials also advised employees to monitor and report suspicious activity. (*Id.* ¶ 12.) In particular, employees were required to monitor and report financial transactions in excess of $10,000. (*Id.*) Moreover, employees were trained to recognize "structuring transactions," whereby persons seeking to avoid reporting financial transactions in excess of $10,000 structure the financial transaction into multiple smaller transactions below the $10,000 reporting threshold. (*Id.*) Employees were advised that it is unlawful to structure or assist in structuring any transaction. (*Id.*) Sovereign employees are required to report structuring activity to Sovereign's Loss Prevention and Security ("LP&S") Department. (*See id.* ¶ 15.)

Plaintiff participated in an online training program regarding the BSA and passed an online test regarding the same. (*Id.* ¶ 13.) Plaintiff understood that it was her obligation as a teller to "be on the lookout" for suspicious activity and report the same. (*Id.*) In addition, plaintiff understood that

if a branch manager thought that a teller had engaged in "suspicious activity" the manager had an obligation to report the same to Sovereign's LP&S Department.  (*Id.* ¶ 15.)

### C. Plaintiff's Allegations of National Origin Discrimination

Plaintiff testified that she was discriminated against in October 2006 by having to account for a shortage in the branch's night deposit box.  (*See* Doc. No. 13, Affirmation of Anthony C. Giordano ("Giordano Aff."), Ex. 3, Deposition of Faina Vinokur ("Pl. Dep.") at 99-100; Def. 56.1 Stmt. ¶ 72.) Plaintiff testified that after a bank customer insisted that his deposit had contained $590 more than the amount plaintiff had counted, Ms. Scalici and Ms. Baldassarre instructed plaintiff to record a "short" for the teller box and note her teller identification number ("TIN").  (Pl. Dep. at 100-104.) Plaintiff refused to record her TIN.  (*Id.* at 102.)  Plaintiff acknowledged that Ms. Scalici requested that plaintiff "take the short" because "she was friends with the customer and . . . wanted to be good to the customer" and that it had "nothing to do with" plaintiff.  (*Id.* at 105.)  Plaintiff believes that she was discriminated against because "[t]hey [sic] never happened with nobody in our branch."  (*Id.* at 104.)  Plaintiff testified that she was never disciplined for the "short" or refusing to "take" the short.  (*Id.* at 103, 109.)

Plaintiff further testified that on more than two occasions, Ms. Baldassarre stood behind her in the teller area while plaintiff spoke in Russian to a Russian customer. (Pl. Dep. at 105-106.) Plaintiff acknowledged that neither Ms. Baldassarre nor Ms. Scalici prohibited plaintiff from speaking in Russian to customers or co-workers. (*Id.* at 107, 110.) Plaintiff testified, however, that Pat Walter, a former Head Teller, told her not to speak in Russian with co-workers. (*Id.* at 110.)

Plaintiff testified that she heard Pakistani co-workers speak to Pakistani customers and each other in their native language. (*Id.* at 109-110.) Plaintiff did not alert branch management nor complain about disparate treatment. (*See id.* at 110.)

### D. Plaintiff's Work Schedule and Request for Accommodation

According to defendant, the branch required all full-time tellers to work five days per week. (Def. 56.1 Stmt. ¶ 19.) At all relevant times, the branch was open from 9:00 a.m. to 5:00 p.m. on Monday, Tuesday, Wednesday and Friday, 9:00 a.m. to 7:00 p.m. on Thursday, 9:00 a.m. to 1:00 p.m. on Sunday and was closed on Saturday.[3] (*Id.; see* Pl. 56.1 Stmt. ¶ 19; *see also*

_____

[3] Plaintiff disputes the branch's schedule, but does not proffer evidence regarding the branch's hours of operation. (*See* Pl. 56.1 Stmt. ¶ 19.) Plaintiff's deposition testimony, however,

Doc. No. 12, Affirmation of Wendy J. Mellk ("Mellk Aff."), Ex.
H, Affidavit of Karyn Baldassarre ("Baldassarre Aff.") ¶ 3.)
According to defendant, until April 2007, plaintiff was
typically scheduled to work Monday through Friday, and worked on
Sunday every three to four weeks.  (Def. 56.1 Stmt. ¶ 20.)
Although plaintiff does not dispute this fact, plaintiff adds
that "for a three month period she worked six days a week."
(Pl. 56.1 Stmt. ¶ 20.)

In March 2007, plaintiff's medical worsened and she
sought to reduce her weekly schedule from 40 hours to 32 hours.
(Pl. Dep. at 177; Def. 56.1 Stmt. ¶ 30.)  Accordingly, plaintiff
contacted Lisa Wagner, a Sovereign human resources employee
located in Pennsylvania with responsibility over retirement
benefits.  (Def. 56.1 Stmt. ¶ 36; Baldassarre Aff. ¶ 7.)
According to plaintiff, Ms. Wagner advised plaintiff that it was
possible to work 32 hours per week and remain classified as a
full-time employee for benefits purposes.  (*See* Pl. Dep. at 179-
181; Def. 56.1 Stmt. ¶ 36; Pl. 56.1 Stmt. ¶ 36.)  Plaintiff
testified that Ms. Wager advised her that plaintiff's manager
"just have to send to payroll department your scheduled hours."
(Pl. Dep. at 179.)

---

reveals that there is no dispute as to the branch's hours of
operation.  (*See* Pl. Dep. at 55-56.)

It is undisputed that Ms. Wagner had no authority over, and did not participate in, branch staffing decisions. (Def. 56.1 Stmt. ¶ 37.) Defendant contends that Ms. Wagner told plaintiff that branch staffing decisions are made by the Branch Manager and Sovereign's District Executive. (*Id.* ¶ 38.) Consequently, Ms. Wagner discussed plaintiff's request with Branch Manager Karyn Baldassarre. (*See* Baldassarre Aff. ¶¶ 9-10.)

Before speaking with plaintiff, Ms. Baldassarre discussed plaintiff's request with Robert Vivo, Sovereign's District Executive. (Baldassarre Aff. ¶ 17.) Ms. Baldassarre and Mr. Vivo agreed that a reduction in plaintiff's weekly schedule to four days would require increasing other tellers' hours or hiring a new employee to replace plaintiff's lost day. (*Id.*)

Thereafter, Ms. Baldassarre spoke with plaintiff regarding her request to work 32 hours per week. (Def. 56.1 Stmt. ¶ 30; Pl. Dep. at 195-196.) Plaintiff testified that she requested not to work on Thursdays, the day on which the branch remained open until 7:00 p.m. (Pl. Dep. at 96, 206; *see* Pl. 56.1 Stmt. ¶ 30.) Although plaintiff testified that she was asked for medical documentation in support of her request (Pl. Dep. 192), she subsequently testified that she was not asked for any such documentation (*id.* at 193). Notwithstanding, plaintiff

presented to Ms. Baldassarre a note from her physician, Dr.
Yusuf Yazici, in support of her request. (*See* Pl. Dep. at 192.)
Although neither party has submitted the physician's note in
connection with the instant motion, the parties agree that the
note indicated only that plaintiff could not work evening hours
past 5:00 p.m. (*Id.* at 32; Def. 56.1 Stmt. ¶ 34.) Plaintiff
testified that Dr. Yazici's note pertained "just for Thursday
night." (Pl. Dep. at 241; Def. 56.1 Stmt. ¶ 34.)

It is undisputed that plaintiff did not provide
additional medical documentation in support of her request for a
32-hour, four-day work week. (Def. 56.1 Stmt. ¶ 49; Pl. Dep.
193.) Plaintiff testified that she advised Ms. Baldassarre that
she would provide medical documentation in support of her
request if needed, but was never asked to do so. (Pl. Dep. at
182, 193-194.) By contrast, Ms. Baldassarre states that she
advised plaintiff that medical documentation was required to
support her request. (Baldassarre Aff. ¶ 12.) Plaintiff
testified that she was at Ms. Baldassarre's desk when she
emailed Mr. Vivo concerning plaintiff's request, and plaintiff
recalls that Ms. Baldassarre informed Mr. Vivo that plaintiff
would provide medical documentation to support her request if
needed. (Def. 56.1 Stmt. ¶ 40.)

On April 4, 2007, plaintiff's husband apparently
called Mr. Vivo to inquire why his wife's weekly schedule could

not be reduced to 32 hours.  Gregoria Perez, the branch's
Employee Relations Manager, returned the call on Mr. Vivo's
behalf.  (Mellk Aff., Ex. I, Affidavit of Gregoria Perez ("Perez
Aff.") ¶ 14 and Ex. B, Handwritten Notes dated April 4, 2007;
Pl. 56.1 Stmt. ¶ 43.)  Ms. Perez advised Mr. Vinokur that
plaintiff had to provide medical documentation in support of her
request.  (Perez Aff. ¶ 14.)  Plaintiff, who was not present for
and did not overhear this conversation (Pl. Dep. at 205), claims
that her husband was told by Ms. Perez "old employee like to
take 32 hours just take care of grandchildren" (*id.* at 95).

In early April 2007, a brief meeting was held between
plaintiff, Ms. Baldassarre and Ms. Scalici regarding plaintiff's
request for a reduced weekly schedule.  Plaintiff testified that
during this meeting, Ms. Scalici asked her "if another teller,
old teller who work here, like to take care of grandchildren and
come to me and ask about 32 hours, what I will do? . . . And she
[Scalici] asked me how you think it will look if you work 32
hours?"  (Pl. Dep. at 206.)  Plaintiff responded, "I just want
to need one day off, the long day off."  (*Id.*)  Accordingly,
plaintiff agreed to work Sundays and take Thursdays off.  (*See*
Pl. Dep. at 207-209; Def. 56.1 Stmt. ¶ 44; Pl. 56.1 Stmt. ¶ 44.)
Plaintiff later testified that she "was not happy with this but
I don't have another choice.  It was agreement." (Pl Dep. at
207.)

Approximately 30 minutes later, a telephone conference call was held between plaintiff, Ms. Baldassarre, Mr. Vivo and Ms. Perez regarding plaintiff's request.  Ms. Baldassarre testified that she suggested that plaintiff work Sundays and take Thursdays off.  (Baldassarre Dep. at 18.)  Plaintiff was also advised that she could work a part-time schedule.  (*Id.*)  Plaintiff never inquired about her eligibility for benefits as a part-time employee.  (Pl. Dep. at 242.)

Plaintiff testified that during this call, she was advised that she could not work 32 hours per week and remain full time.  (Pl. Dep. at 209.)  Plaintiff was told that she would "have to go part time and go on disability."  (*Id.* at 209.)  By contrast, Ms. Baldassarre explained that the branch required its full-time employees to work 40 hours, 5 days per week, and that if plaintiff wanted to work 4 days per week, she had to provide medical documentation regarding her limitations.  (Baldassarre Aff. ¶ 16.)

It is undisputed that plaintiff requested her physician to provide a note in support of her request for a 32-hour, four-day work week.  (Def. 56.1 Stmt. ¶ 49; Pl. 56.1 Stmt. ¶ 49; Pl. Dep. at 241-242.)  According to plaintiff, her physician declined to do so because "she [the physician] told me if she give me this note, they automatically put me for part-time worker."  (Pl. Dep. at 241-242.)  Plaintiff testified that

her physician had not seen any of defendant's policies. (*Id.* at 242.)

According to defendant, plaintiff agreed to work on Sundays instead of Thursdays, and commenced her new schedule on April 8, 2007. (Def. 56.1 Stmt. ¶ 48.) Plaintiff later testified, however, that "[t]hey pushed me to work every Sunday." (Pl. Dep. at 211.) Plaintiff was not "happy" that she was not given the 32-hour schedule. (Pl. Dep. at 207, 246.) Plaintiff explained that working on Sundays interfered with her "weekend time to be with [her] family and husband." (*Id.* at 212-213.) Notwithstanding, plaintiff testified that she continued to "perfor[m][her] job very well." (*Id.* at 246; *see* Def. 56.1 Stmt. ¶ 48; Pl. 56.1 Stmt. ¶ 48.) Plaintiff testified that she never complained that she was subjected to discrimination based on her medical condition because she was "scared." (*Id.* at 246-247.) Plaintiff claims that she was scared because "I am not young and for any reason they can fire me." (*Id.* at 247.)

## E. **Plaintiff's Termination**

On or about May 18, 2007, Ms. Baldassarre was informed by Pat Persuad, Assistant Manager for the branch, that plaintiff made a series of deposits and withdrawals that appeared to be "suspicious activity" under defendant's policies regarding the BSA. (Def. 56.1 Stmt. ¶ 53; Baldassarre Aff. ¶ 21.) According

to defendant, "plaintiff appeared to be structuring transactions by making a number of deposits in the exact amount of $10,000, and then, a couple of days later, withdrawing the same amount in cash through different tellers." (Def. 56.1 Stmt. ¶ 53; *see* Baldassarre Aff. ¶ 22.) Ms. Baldassarre believed that she had a duty to report the suspicious activity to Sovereign's Loss Prevention and Security Department, and did so. (*Id.*) Ms. Baldassarre states that plaintiff's medical condition and request for accommodation "played no role in my report of her suspicious activity . . . ." (*Id.* ¶ 23.) Indeed, Ms. Baldassarre states that she believed her "job would be in jeopardy" if she failed to report plaintiff's suspicious activity. (*Id.* ¶ 22.) After reporting plaintiff's activity to the LP&S Department, Ms. Baldassarre informed Mr. Vivo and Ms. Scalici that she had done so. (*Id.*)

An investigation by Sovereign's LP&S Department revealed that plaintiff had made a series of eight transactions between March 27, 2007 and April 18, 2007. (See Def. 56.1 Stmt. ¶ 55; Perez Aff. ¶ 22 and Ex. D, Case Report and Notes, annexed thereto.) Specifically, plaintiff made the following deposits and withdrawals:

> March 27, 2007: a single $10,000 check deposit into plaintiff's Sovereign account drawn from plaintiff's Chase Bank account;

14

April 3, 2007: cash withdrawal of $10,000 from
plaintiff's Sovereign account;

April 3, 2007: deposit of three checks totaling
$10,000, drawn from plaintiff's Chase account,
into her Sovereign account;

April 5, 2007: deposit of four checks totaling
$10,000, drawn from plaintiff's Chase account,
into her Sovereign account;

April 9, 2007: cash withdrawal of $10,000 from
plaintiff's Sovereign account;

April 9, 2007: deposit of four checks totaling
$10,000, drawn from plaintiff's Chase account,
into her Sovereign account;

April 13, 2007: cash withdrawal of $10,000 from
plaintiff's Sovereign account; and

April 18, 2007: cash withdrawal of $10,000 from
plaintiff's Sovereign account.

(Def. 56.1 Stmt. ¶ 55.) The investigation also revealed that

plaintiff had deposited into her Sovereign account numerous

double-endorsed checks made out to her son-in-law. (*Id.* ¶ 57.)

On May 21, 2007, plaintiff was interviewed by

Sovereign's LP&S Department regarding her recent transactions.

(*See* Pl. 56.1 Stmt. ¶ 58; Perez Aff. ¶ 20.) Mr. Vivo, Ms. Perez

and Ms. Scalici were present for the interview. (Def. 56.1

Stmt. ¶ 58.) Among other things, plaintiff was asked to explain

why she (i) deposited multiple checks in $10,000 increments over

several transactions, (ii) did not withdraw cash from her Chase

account, and (iii) did not deposit one check for $40,000, the

total amount in question, into her Sovereign account. (*See*

Perez Aff. ¶ 24.) In response, plaintiff stated that she carried out the transactions to help her daughter complete a home renovation project. (Pl. Dep. at 231; *see* Perez Aff. ¶ 24.) Plaintiff explained that her daughter and son-in-law were very busy, did not have time to visit the bank and did not have ATM cards. (*See* Perez Aff., Ex. C, Handwritten notes from interview; *see also* Pl. Dep. at 227.)[4]

Plaintiff later testified that she believed she had sufficiently explained the transactions and done nothing wrong. Specifically, plaintiff testified that "I just transferred money from one bank to another bank. I don't know why it is structure. Because it is my money. I did not put somebody else money. It is my money." (Pl. Dep. at 230.) Plaintiff further testified that she would have made the deposits and withdrawals in question even if the bank had allowed her to work a 32-hour work week. (*Id.* at 232.) Nevertheless, plaintiff testified that she would have reported similar unusual activity of another teller or customer. (*Id.* at 227-29; *see* Pl. 56.1 Stmt. ¶ 56.)

Defendant points out that plaintiff's age, national origin and accommodation request were not discussed during the interview. (*See* Pl. Dep. at 231-32.) Plaintiff testified that she asked Mr. Vivo not to terminate her employment because she

---

[4] There is no indication whether the home renovation could have been paid for by check or on credit.

16

would lose her health benefits. (*Id.* at 231.) According to plaintiff, Mr. Vivo did not respond and asked plaintiff to go home while the investigation proceeded. (*Id.*)

According to defendant, "[b]ased on Ms. Vinokur's apparent structuring of transactions and her inadequate explanation for doing so," the LP&S Department recommended that plaintiff be discharged. (Perez Aff. ¶ 25; *see* Def. 56.1 Stmt. ¶ 62; Pl. 56.1 Stmt. ¶ 62.) Accordingly, on May 22, 2007, Ms. Perez and her supervisor authorized plaintiff's discharge "as a result of her violation of Sovereign's policies and procedures." (Perez Aff. ¶ 26.) The same day, Ms. Perez advised plaintiff that she was discharged "as a result of her structuring of her banking transactions in violation of Bank policy and procedure." (*Id.* ¶ 28; Def. 56.1 Stmt. ¶ 64; Pl. 56.1 Stmt. ¶ 64.)

## DISCUSSION

### A. Summary Judgment Standard

A court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of

*material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation and internal quotation marks omitted). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation and internal quotation marks omitted). Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001). Nevertheless, the nonmoving party may not rest "merely on allegations or denials" but must instead "set out specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Harlen Assocs. v.*

*Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) ("[M]ere speculation and conjecture is [sic] insufficient to preclude the granting of the motion.")

"Employment discrimination cases raise special issues on summary judgment." *Kenney v. New York City Dep't of Educ.*, No. 06-CV-5770, 2007 U.S. Dist. LEXIS 77926, at *7 (S.D.N.Y. Oct. 22, 2007). Specifically, employment discrimination cases that involve a dispute concerning the "employer's intent and motivation," may not be suitable for summary judgment. *Id.; see Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The Second Circuit has noted, however, that "we went out of our way to remind district courts that the impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 44 (2d Cir. 2000) (internal quotation marks and citations omitted); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("trial courts should not 'treat discrimination differently from other ultimate questions of fact.'") (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 524 (1993)); *Holcomb*, 521 F.3d at 137 ("Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment").

## B. Legal Standard for
## Disparate Treatment Claims

The parties agree that plaintiff's claims of disparate treatment based on age, national origin and disability, under the NYSEL and NYCHRL, are analyzed pursuant to the burden-shifting framework established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). (*See* Doc. No. 12, Defendant's Memorandum of Law in Support of its Motion for Summary Judgment ("Def. Mem.") at 12-13; Doc. No. 15, Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Mem.") at 3-4.) *See Weinstock*, 224 F.3d at 42 n.1 (employment discrimination claims under the NYSEL are subject to the same standard of proof as claims under Title VII); *Forrest v. Jewish Guild for the Blind*, 309 A.D.2d 546, 552 (1st Dep't 2003) ("the standard for recovery under section 296 of the Executive Law is in accord with the federal standards under title VII of the Civil Rights Act of 1964 . . . and the human rights provisions of New York City's Administrative Code mirror the provisions of the Executive Law") (citations omitted); *see also Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n.1 (2d Cir. 2009) (noting that age discrimination claims brought pursuant to the NYSEL and the NYCHRL are analyzed under Title VII framework); *Kaur v. New York City Health & Hosps. Corp.*, No. 07-CV-6175, 2010 U.S. Dist. LEXIS 15455, at *54-5 (S.D.N.Y. Feb.

19, 2010) ("None of the 2005 Restoration Act's amendments to the NYCHRL altered the standard by which a court should determine whether a discriminatory act has occurred") (citation and internal quotation marks omitted).

Initially, plaintiff bears the burden of establishing a *prima facie* case of discrimination. To establish a *prima facie* case, plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) such adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See McDonnell-Douglas*, 411 U.S. at 802-803. Plaintiff's burden to establish a *prima facie* case has been characterized "*de minimis*." *Schwaller v. Squire Sanders & Dempsey*, 249 A.D.2d 195, 196 (1st Dep't 1998) (citations omitted); *see Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) (citation omitted).

If plaintiff can establish a *prima facie* case, the burden shifts to defendant to articulate a "legitimate, independent, and nondiscriminatory" reason to support its employment decision. *Miller Brewing Co. v. State Div. of Human Rights*, 66 N.Y.2d 937, 938 (1985) (age discrimination case under NYSEL); *see McDonnell Douglas*, 411 U.S. at 802-803. This "burden is one of production, not persuasion . . . and involves no credibility assessment of the evidence." *Pathare v. Klein*,

No. 06-CV-2202, 2008 U.S. Dist. LEXIS 69119, at *12 (S.D.N.Y. Sept. 12, 2008) (national origin claims under Title VII, NYSEL and NYCHRL) (citations omitted), *aff'd*, 347 Fed. Appx. 646 (2d Cir. Sept. 30, 2009).

If defendant satisfies its burden, plaintiff must present evidence to demonstrate that defendant's reason is a mere pretext for an impermissible discriminatory motive. *McDonnell-Douglas*, 411 U.S. at 804; *Miller Brewing Co.*, 66 N.Y.2d at 939 (citations omitted). In the summary judgment context, this means plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for its decision to discharge is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994).

## C. Age and National Origin Discrimination Claims

### i. Plaintiff's *Prima Facie* Case

Defendant contends that plaintiff has failed to establish a *prima facie* case of age and national origin discrimination. For purposes of the instant motion, however, defendant does not dispute that plaintiff has satisfied the

first two elements of the *prima facie* analysis: that plaintiff is a member of a protected class and was qualified for the bank teller position. (Def. Mem. at 14 n. 4.)

As to the third element, defendant contends that plaintiff has failed to establish that she suffered an adverse employment action. (*Id.* at 14-16.) Specifically, defendant argues that its decision not to provide plaintiff a 32-hour, four-day work week was not an adverse employment action. (*See id.* at 14-15.)

Plaintiff contends that her termination constitutes an adverse employment action. (*See* Pl. Mem. at 11.) The court agrees. "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (2d Cir. 1993) (citation omitted).

As to the fourth element, defendant contends that the employment actions of which plaintiff complains did not occur under circumstances giving rise to an inference of discrimination. (*See* Def. Mem. at 15-16.) In this regard, defendant points out that there is no evidence that defendant

treated younger, non-Russian full-time employees more favorably than plaintiff.  (Def. 56.1 Stmt. ¶ 79; *see* Def. Mem. at 15-16.)

With respect to her age discrimination claim, plaintiff contends that her supervisors' remarks concerning "grandchildren" reflect an animus toward older employees.  In particular, plaintiff claims that her husband was told by Ms. Perez "old employee like to take 32 hours just take care of grandchildren."  (Pl. Dep. at 95.)  Moreover, plaintiff testified that during a meeting with Ms. Scalici and Ms. Baldassarre, Ms. Scalici asked plaintiff "if another teller, old teller who work here, like to take care of grandchildren and come to me and ask about 32 hours, what I will do?" (Pl. Dep. at 206.)  Although Ms. Perez's alleged statement is inadmissible hearsay, if not double hearsay, Ms. Scalici's statement is admissible.

Notwithstanding, Ms. Scalici's statement is insufficient to give rise to an inference of discrimination. Simply because Ms. Scalici mentioned that other employees may seek reduced schedules to care for their grandchildren does not raise an inference that plaintiff was terminated because of her age.  Indeed, "[c]ourts in this Circuit have recognized that any inference of age discrimination is undercut where, as here, a

plaintiff is over 40 years old when she is hired."[5]  *Bailey v. Frederick Goldman, Inc.*, No. 02-CV-2429, 2006 U.S. Dist. LEXIS 12453, at *12 (S.D.N.Y. Mar. 23, 2006) (citing *Boyle v. McCann-Erickson, Inc.*, 949 F. Supp. 1095, 1104 (S.D.N.Y. 1997)).  Thus, plaintiff has failed to establish a *prima facie* case of age discrimination.  Accordingly, plaintiff has failed to establish a *prima facie* case of age discrimination.

With respect to her national origin discrimination claim, plaintiff alleges that she was intimidated because she is Russian.  (*See* Pl. Mem. at 15.)  In particular, plaintiff testified that she was asked to take a "short" because she is Russian.  (Pl. Dep. at 99-100.)  Notwithstanding, plaintiff testified that she was never disciplined for the short or refusing to take the short.  (*Id.* at 103, 109.)

Plaintiff further contends that was made to feel "uncomfortable for speaking Russian . . . ."  (Pl. Mem. at 15; Pl. Dep. at 105-106.)  Plaintiff testified that Ms. Baldassarre stood behind her while plaintiff spoke in Russian to a Russian customer.  (Pl. Dep. at 105-106.)  Yet, plaintiff acknowledged

---

[5] The Age Discrimination in Employment Act (ADEA) protects persons who are 40 or over from discharge by virtue of that person's age.  *See* 29 U.S.C. §§ 623(a)(1), 631(a).  Substantively, the law under the NYSEL and NYCHRL is the same as the ADEA.  *See Ahmed v. Heartland Brewery L.L.C.*, No. 05-CV265, 22007 U.S. Dist. LEXIS 53632, at *11-12 (S.D.N.Y. Jul. 25, 2007); *Emanuel v. Oliver, Wyman & Co., L.L.C.*, 85 F. Supp. 2d 321 (S.D.N.Y. 2000).

that neither Ms. Baldassarre nor Ms. Scalici prohibited plaintiff from speaking in Russian to customers or to any co-worker. (*Id.* at 107, 110.)[6]

On the present record, there is no evidence that plaintiff was discriminated against based on her Russian national origin. There is no evidence to indicate that plaintiff was asked to "take a short" because she is Russian. Nor is there any evidence to suggest that Ms. Baldassarre stood behind plaintiff while plaintiff spoke in Russian because she harbored discriminatory animus toward plaintiff's Russian national origin. Plaintiff's conclusory allegation that she was terminated based on her national origin is insufficient to give rise to an inference of discrimination or raise a triable issue of fact for trial. *See Lama*, 1999 U.S. Dist. LEXIS 16966, at *8 ("[p]laintiff cannot sustain an action based on [her] conclusory allegations of discrimination.") (citation omitted). Accordingly, plaintiff has failed to establish a *prima facie* case of national origin discrimination.

### ii. Defendant's Legitimate, Non-discriminatory Reason

Even assuming, *arguendo*, that plaintiff has established a *prima facie* case of age or national origin

---

[6] Plaintiff testified that Pat Walter, a former Head Teller, told her not to speak in Russian with co-workers. (Pl Dep. at 110.) But plaintiff does not claim that Ms. Walter disciplined plaintiff for speaking in Russian.

discrimination, defendant clearly satisfies its burden of production at the second stage of the *McDonnell Douglas* analysis to articulate a legitimate, non-discriminatory reason for its actions. Defendant has established, through admissible evidence, that it terminated plaintiff because of her violation of Sovereign's policy against "structuring" banking transactions, in violation of the BSA. (*See* Perez Aff. ¶ 25; *see* Def. 56.1 Stmt. ¶ 62; Pl. 56.1 Stmt. ¶ 62.) Thus, defendant has satisfied its burden of production at this stage. *See Pierre v. JPMorgan Chase Bank*, No. 05-CV-1297, 2008 U.S. Dist. LEXIS 59215, at *11 (S.D.N.Y. Aug. 6, 2008) (defendant articulated legitimate, non-discriminatory reason for plaintiff's termination where the plaintiff "was found to have circumvented the reporting requirement in violation of the Bank Secrecy Act, and failed to consult with her manager prior to taking such actions").

### iii. **Pretext**

Because defendant has clearly articulated a legitimate, non-discriminatory reason for plaintiff's discharge, plaintiff must establish, through admissible evidence, a triable issue of fact as to whether defendant's proffered reason for its action is a pretext for unlawful discrimination. *See Hicks*, 509 U.S. at 507-508. In this regard, plaintiff must establish that

"*both* that the reason was false, *and* that discrimination was the real reason." *See id*. at 515 (emphasis in original).

In support of her position that defendant's stated reason is pretextual, plaintiff contends that her suspicious banking activities were "explained away . . . in that her daughter borrowed money for home renovation." (Pl. Mem. at 19.) Plaintiff argues that defendant "used" plaintiff's actions "as an excuse" to discharge plaintiff. (*Id*.)

Contrary to plaintiff's contention, there is no evidence to indicate that defendant's stated reason for its action was false. The undisputed evidence demonstrates that, "[b]ased on Ms. Vinokur's apparent structuring of transactions and her inadequate explanation for doing so," Sovereign's LP&S Department recommended that plaintiff be discharged. (Perez Aff. ¶ 25; *see* Def. 56.1 Stmt. ¶ 62; Pl. 56.1 Stmt. ¶ 62.) The undisputed evidence further indicates that defendant's Human Resources Department followed that recommendation. (*See* Perez Aff. ¶¶ 26-28.)

Nor is there any evidence to indicate that unlawful discrimination was the "real reason" for plaintiff's termination. *See Hicks,* 509 U.S. at 515. To the contrary, the undisputed evidence indicates that plaintiff's unusual banking activities were reported in accordance with Sovereign's policies and its legal obligations under the BSA. Indeed, plaintiff

testified that she would have reported similar unusual activity of another teller or customer.  (Pl. Dep. at 227-229; *see* Pl. 56.1 Stmt. ¶ 56.)  Moreover, plaintiff testified that her age, national origin and accommodation request were not discussed during the investigation into plaintiff's suspicious banking activity.  (*See* Pl. Dep. at 231-232.)  Nor is there any evidence that other employees were treated more favorably than plaintiff under similar circumstances.

Even if defendant's LP&S Department was wrong in its conclusion that plaintiff had violated Sovereign's policies and failed to provide an adequate explanation for her actions, "this Court's role is not to second-guess business decisions or to question a corporation's means to achieve a legitimate goal." *See Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 290 (S.D.N.Y. 1999) (Sotomayor, C.J.) (internal quotation marks and citation omitted).  "Absent discrimination, an employer may fire an employee for a good reason, bad reason, a reason based on erroneous facts, or no reason at all, so long as its action is not based on a discriminatory reason."  *Id.*

Because there is no evidence from which a reasonable juror could find that defendant's stated legitimate reason for plaintiff's termination was false, and that discrimination was the real reason for defendant's actions, summary judgment as to plaintiff's age and national origin discrimination claims is

warranted.  Accordingly, plaintiff's age and national origin discrimination claims are dismissed.

### D. **Disability Discrimination Claims**

The NYSEL and NYCHRL prohibit an employer from discriminating against an employee because of a disability. *See* NYSEL § 296(1); NYCHRL, Admin. Code § 8-107(1)(a).  As with other employment discrimination claims brought pursuant to the NYSEL and NYCHRL, disability discrimination claims are evaluated under the *McDonnell Douglas* burden-shifting framework.  *See Tebbenhoff v. Elec. Data Sys. Corp.*, No. 02-CV-2932, 2005 U.S. Dist. LEXIS 29874, at *16 (S.D.N.Y. Nov. 25, 2005).

Under the *McDonnell Douglas* framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination, "*i.e.*, that she suffers from a disability, was qualified to hold the position at issue, and suffered an adverse employment action or was terminated from employment under circumstances giving rise to an inference of discrimination." *Cuccia v. Martinez & Ritorto, PC*, 61 A.D.3d 609, 610 (1st Dep't 2009); *Engelman v. Girl Scouts-Indian Hills Council, Inc.*, 16 A.D.3d 961, 962 (3d Dep't 2005); *see Tebbenhoff*, 2005 U.S. Dist. LEXIS 29874, at *13-14 (citations omitted).

For purposes of the instant motion, the parties do not dispute that plaintiff suffers from a disability[7] and that she was qualified for the bank teller position. (*See* Def. Mem. at 14 n.4.) Instead, the parties dispute whether plaintiff has established the whether her request for a 32-hour work week and termination occurred under circumstances giving rise to an inference of discrimination.

Plaintiff contends that defendant's alleged refusal to reduce plaintiff's work shift raises an inference of discrimination. (*See* Pl. Mem. at 15.) Plaintiff claims that Ms. Scalici's concern about the consequences of accommodating

---

[7] Under the NYSEL, the term "disability" means "(a) a physical. . . impairment . . . which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held." NYSEL § 292(21). "Thus an individual can be disabled under the [Human Rights Law] if his or her impairment is demonstrable by medically accepted techniques; it is not required that the impairment substantially limit that individual's normal activities." *Lovely H. v. Eggleston*, 235 F.R.D. 248, 260 (S.D.N.Y. 2006) (quoting *Hazeldine v. Beverage Media Ltd.*, 954 F. Supp. 697, 706 (S.D.N.Y. 1997)); *see Caronia v. Hustedt Chevrolet*, No. 05-CV-3526, 2009 U.S. Dist. LEXIS 27145, at *25 (E.D.N.Y. Apr. 1, 2009).

Under the NYCHRL, the term "disability" means "any physical . . . impairment, or a history or record of such impairment . . . The term "physical . . . impairment" means: . . . an impairment of any system of the body. . . ." N.Y.C. Admin. Code § 8-102(16).

plaintiff is evidence of her discriminatory animus. (*See id.*)
Plaintiff testified that Ms. Scalici asked her "if another
teller, old teller who work here, like to take care of
grandchildren and come to me and ask about 32 hours, what I will
do? . . . And she [Scalici] asked me how you think it will look
if you work 32 hours?" (Pl. Dep. at 206.)  Plaintiff also
claims that her medical condition "frustrated her manager to the
point manager would be mad at her." (*Id.* ¶ 24.)

        Defendant disputes that plaintiff was terminated under
circumstances giving rise to an inference of discrimination.
(*See* Def. Mem. at 21-22; Pl. Mem. at 15-16.)  In particular,
defendant points out that plaintiff was retained by Sovereign
"for a number of years after being diagnosed with Rheumatoid
Arthritis, during which she took at least 5 medical leaves of
absence . . . ." (Def. Mem. at 22; *see* Def. 56.1 Stmt. ¶ 22.)
Defendant also points out that no bank employee "made any
negative remark" about plaintiff's medical condition (Def. Mem.
at 22; *see* Def. 56.1 Stmt. ¶ 23; Pl. Dep. at 88) and that
plaintiff's leaves of absence did not adversely affect her
employment at Sovereign.  (Pl. Dep. at 129-130; *see* Def. 56.1
Stmt. ¶ 25.)  Defendant also claims that the requests of two
non-disabled employees for a 4-day work week were denied.  (Doc.
No. 12, Defendant's Reply Memorandum of Law ("Def. Reply Mem.")
at 8.)

"While 'there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision,' . . . a plaintiff cannot simply rely on the fact that [s]he was terminated.  Rather, [s]he must point to facts that suggest the termination was motivated, at least in part, by animus based on [her] alleged disability." *Lama v. Consolidated Edison Co.*, No. 98-CV-5084, 1999 U.S. Dist. LEXIS 16966, at *6-7 (E.D.N.Y. Oct. 18, 1999) (ADA claim) (quoting *Chertvoka v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).  A "[p]laintiff cannot sustain an action based on [her] conclusory allegations of discrimination."  *Lama*, 1999 U.S. Dist. LEXIS 16966, at *8 (quoting *Valentine*, 50 F. Supp. 2d at 283).

The court concludes that plaintiff has failed to establish that her termination took place under circumstances that give rise to an inference of discrimination based on disability.  Contrary to plaintiff's contention, no reasonable jury could find that plaintiff's supervisor's alleged statements and actions evidence a discriminatory animus toward plaintiff based on her alleged disability.  That Ms. Scalici expressed concern about the consequences of modifying plaintiff's schedule is not evidence of discriminatory animus.  Nor is there evidence of other actions or remarks by decision makers that could be viewed as reflecting discriminatory animus toward plaintiff.

Further, there is no evidence that non-disabled employees received preferential treatment.

Even assuming that plaintiff has established a *prima facie* case of disability discrimination, summary judgment is nevertheless appropriate. As previously mentioned, establishment of a *prima facie* case of discrimination shifts the burden to defendant to articulate a "legitimate, independent, and nondiscriminatory" reason to support its employment decision. *Miller Brewing Co.,* 66 N.Y.2d at 938; *see McDonnell Douglas*, 411 U.S. at 802-803. Defendant has articulated through admissible evidence that plaintiff was terminated because of her violation of Sovereign's anti-structuring policy. (*See* Perez Aff. ¶ 25; *see* Def. 56.1 Stmt. ¶ 62; Pl. 56.1 Stmt. ¶ 62.) Further, as previously discussed, plaintiff has failed to offer any evidence, as she is required, demonstrating that defendant's stated legitimate, non-discriminatory reason for terminating plaintiff "was not its true motivation or that discriminatory animus drove its actions." *See Lama*, 1999 U.S. Dist. LEXIS 16966, at *9. Accordingly, plaintiff's disability discrimination claims are dismissed.

### E. Failure to Accommodate Claim

Both the NYSEL and NYCHRL make it unlawful for an employer to fail to provide reasonable accommodations to known disabilities of their employees. *See* NYSEL § 296(3)(a); NYCHRL,

Admin. Code 8-107(15)(a). Further, both statutes also "envisage employer and employee engaged in an interactive process in arriving at a reasonable accommodation for a disabled employee." *Pimentel v. Citibank, N.A.,* 29 A.D.3d 141, 149 (1st Dep't 2006) (citing *Parker v Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir. 2000); *see Phillips v. City of New York*, 66 A.D.3d 170 (1st Dep't 2009)).

Defendant contends that plaintiff's failure to accommodate her rheumatoid arthritis fails for two reasons: (1) plaintiff refused to engage in the "interactive process" required by the NYSEL and NYCHRL; and (2) plaintiff was reasonably accommodated in accordance with the limitation set forth in plaintiff's physician's note, which restricted plaintiff from working evening hours past 5:00 p.m. (*See* Def. Mem. at 6-7, 9-10; Pl. Dep. at 32; Def. 56.1 Stmt. ¶ 34.)

By contrast, plaintiff contends that defendant failed to engage in an interactive process and to reasonably accommodate her medical condition by denying her a 32-hour, 4-day work week. (*See* Pl. Mem. at 5-7; Compl. ¶¶ 26, 30-31, 35.) Plaintiff further that contends her requested accommodation was reasonable and that defendant unreasonably "pushed" plaintiff to work Sundays instead of Thursdays. (*See* Pl. Dep. at 211.)

### 1. <u>Interactive Process</u>

"The employer has the responsibility to investigate an employee's request for accommodation and determine its feasibility." *Pimentel,* 29 A.D.3d at 149 (quoting *Parker*, 204 F.3d at 338). Under the regulations adopted pursuant to the NYSEL, "[t]he employer has a duty to move forward to consider accommodation once the need for accommodation is known or requested. The employer has the duty to clearly request from the . . . employee any documentation that is needed." 9 N.Y.C.R.R. § 466.11 (j)(4). The Appellate Division, First Department, recently held that "for both State and City [Human Rights Law] purposes, engagement in an interactive process is itself an accommodation, and the failure to so engage is an unlawful failure to make a reasonable accommodation." *Phillips*, 66 A.D.3d at 176 (on a motion to dismiss, the record was "clear that there *was no* interactive process" whatsoever) (emphasis in original); *but see Hayes v. Estee Lauder Cos., Inc.*, 34 A.D.3d 735, 737 (2d Dep't 2006) ("there is no controlling . . . authority holding that an employer may be held liable based solely on its failure to engage in an interactive process with an employee, absent a showing that the breakdown of the interactive process led to the employer's failure to provide a reasonable accommodation).

Here, each party contends that the other failed to engage in an interactive process. (*See* Def. Mem. at 9-10; Pl. Mem. at 5-7.) Defendant claims that it asked plaintiff for medical documentation to support her accommodation request (Baldassarre Aff. ¶ 12), and that plaintiff's failure to provide "additional medical certification demonstrates her failure to engage in the interactive process" (Def. Mem. at 10; *see* Def. 56.1 Stmt. ¶ 49). Plaintiff contends that defendant's failure to engage in an interactive process is evidenced by defendant's alleged retaliation in response to plaintiff's accommodation request. (Pl. Mem. at 7-8.) Plaintiff does not argue that defendant's alleged failure to request medical documentation is evidence of defendant's failure to engage in an interactive process. (*Cf.* Pl. Dep. at 193-94) (Plaintiff testified that she not asked for additional medical documentation after she provided her first physician's note.)

That the parties dispute whether defendant requested plaintiff to provide additional medical documentation in support of her request is immaterial. Plaintiff provided a doctor's note that restricted her from working evening hours past 5:00 p.m. (*See* Def. Mem. at 6; Pl. Dep. at 32; Def. 56.1 Stmt. ¶ 34.) Further, plaintiff testified that when she requested her physician to provide an additional note in support of her request for a 32-hour work week, her physician declined to do

so.  (Def. 56.1 Stmt. ¶ 49; Pl. 56.1 Stmt. ¶ 49; Pl. Dep. at
241-42.)  Thus, even assuming defendant failed to request
additional medical documentation from plaintiff, such a failure
is insufficient to preclude summary judgment on plaintiff's
failure to accommodate claim.

Upon a review of the record, the court concludes that
both parties engaged in an interactive process concerning
plaintiff's accommodation request.  It is undisputed that
plaintiff requested and was granted Thursdays off.  (*See* Pl.
Dep. at 96; Pl. 56.1 Stmt. ¶ 30.)  Further, with respect to
plaintiff's request for a 32-hour, 4-day work week, plaintiff
provided the only medical documentation available to her: a
doctor's note that restricted plaintiff from working evening
hours past 5:00 p.m.  (*See* Def. Mem. at 6; Pl. Dep. at 32; Def.
56.1 Stmt. ¶ 34.)  Plaintiff's request and medical documentation
were discussed during a series of meetings that included
plaintiff and defendant's managerial and human resources
personnel.  (*See* Pl. Dep. at 207-209; Def. 56.1 Stmt. ¶ 44; Pl.
56.1 Stmt. ¶ 44.)  As a result of the meetings, plaintiff agreed
to work Sundays and take Thursdays off.  (*See* Pl. Dep. at 207-
209.)  Although plaintiff testified that she was "not happy"
with her modified schedule, (*see* Pl Dep. at 207), that is not
evidence of defendant's failure to engage in an interactive
process regarding plaintiff's accommodation request.

## 2. *Prima Facie* Case

To establish a *prima facie* failure to accommodate claim under the NYSEL and NYCHRL, a plaintiff must demonstrate that (1) she has a "disability" within the meaning of the statutes, (2) the employer had notice of the disability, (3) she was otherwise qualified to perform the essential functions of her job with reasonable accommodation, and (4) the employer refused to make a reasonable accommodation. *See Romanello v. Shiseido Cosmetics Am. Ltd.*, No. 00-CV-7201, 2002 U.S. Dist. LEXIS 18538, at *23-24 (S.D.N.Y. Sept. 30, 2002) (observing that, except for the broader definition of "disability" under the NYSEL and NYCHRL, the same standards used to evaluate claims under the Americans with Disabilities Act also apply to cases involving the NYSEL and NYCHRL) (citing *Mitchell v. Washingtonville Central School Distr.,* 190 F.3d 1, 6 (2d Cir. 1999)).

For the purposes of this motion, there is no dispute regarding the first three factors. First, defendant concedes that the plaintiff is disabled within the meaning of the NYSEL and NYCHRL. (*See* Def. Mem. at 14 n.4.) Second, defendant clearly had notice of plaintiff's rheumatoid arthritis as a result of the series of medically-excused leaves of absence granted to plaintiff. Third, it is undisputed that plaintiff performed her job "very well" both before her schedule was

changed and after, and was otherwise qualified to perform the essential functions of her position. (*See* Pl. Dep. at 246; Def. 56.1 Stmt. ¶ 48; Pl. 56.1 Stmt. ¶ 48.)

As to the fourth element, plaintiff asserts that defendant refused to reasonably accommodate her disability. Plaintiff contends that her request for a 32-hour, 4-day work week was reasonable and did not pose a "hardship" because defendant's full-time employees were required to work a minimum of 32 hours per week. (Pl. Mem. at 7.) Plaintiff asserts that defendant unreasonably "pushed" plaintiff to work Sundays instead of Thursdays. (Pl. Dep. at 211.)

Defendant argues that it reasonably accommodated plaintiff. Defendant points out that plaintiff's physician's note restricted plaintiff from working evenings past 5:00 p.m. (Def. Mem. at 6; Def. 56.1 Stmt. ¶ 34.) Defendant contends that, "[i]n accordance with this restriction, Sovereign reasonably adjusted Plaintiff's schedule so that she no longer worked on Thursdays, the only day on which the [branch] is open past 5 p.m." (Def. Mem. at 6-7.) Defendant argues that if plaintiff wanted further accommodation, she should have produced additional medical documentation in support thereof. (*Id.* at 8.) Defendant further argues, without any legal support, that plaintiff's requested 32-hour, 4-day work week would have eliminated an "essential job function" insofar as a "5 day work-

week is an essential function of all full-time" branch employees "due to workload and staffing requirements." (Def. Mem. at 11-12.)

Defendant also contends that plaintiff's "shorter schedule would require other Sovereign employees [at the CBO] to work harder or longer to offset her reduced hours, or would require the Bank to hire another employee." (Def. Mem. at 12.) Indeed, the undisputed evidence indicates that "if Ms. Vinokur's schedule was reduced to 32 hours (4 days a week), the [branch] would be short staffed and that either other tellers would have to increase their hours or a new hire would have to [sic] made to replace Ms. Vinokur's lost day." (Baldassarre Aff. ¶ 17.)

A "reasonable accommodation" is an action that permits a disabled employee "to perform in a reasonable manner the activities involved in the job . . . ." NYSEL § 292(21-e). The NYCHRL defines a reasonable accommodation as "such accommodation that can be made that shall not cause undue hardship . . . ." NYCHRL, Admin. Code § 8-102(18). Pursuant to the NYSEL, a "reasonable accommodation" may include "job restructuring and modified work schedules; provided, however, that such actions do not impose an undue hardship on the business . . . ." NYSEL § 292(21-e).

Based on the undisputed evidence and drawing every inference in plaintiff's favor, no reasonable juror could

conclude that defendant refused or failed to reasonably accommodate plaintiff's disability. On at least five occasions between 1999 and 2006, plaintiff was provided medically-excused leaves of absence from work due to her medical condition. (*See* Def. 56.1 Stmt. ¶ 22.) Further, in response to plaintiff's request for Thursdays off (Pl. Dep. at 96, 206), which was supported by a physician's note indicating that plaintiff could not work evenings past 5:00 p.m., plaintiff was reassigned to work on Sundays, when the branch was open until 1:00 p.m. (*see* Pl. Dep. at 207-209; Def. 56.1 Stmt. ¶ 44; Pl. 56.1 Stmt. ¶ 44). That the parties dispute whether defendant asked for additional medical documentation is immaterial; plaintiff testified that her physician was unwilling to provide further medical certification. (*See* Pl. Dep. at 241-242.)

Although plaintiff was "not happy" with her reassignment (Pl Dep. at 207), she has failed to produce any admissible evidence that the steps taken by defendant to accommodate her disability were unreasonable, otherwise inadequate under the circumstances, or motivated by discriminatory animus. There is also no evidence that plaintiff's reassignment to Sundays resulted in the diminution in her salary or employment benefits. It is undisputed that prior to plaintiff's reassignment in April 2007, she regularly worked on Sunday every three to four weeks. (Def. 56.1 Stmt. ¶

20; Pl. 56.1 Stmt. ¶ 20.)  Moreover, plaintiff's only complaint about her reassignment is that working on Sundays interfered with her "weekend time to be with [her] family and husband." (Pl. Dep. at 212-213.)  Defendant, however, is not required to provide plaintiff with the particular accommodation she "requests or prefers." *Pimentel,* 29 A.D.3d at 148 (internal quotation marks and citation omitted).  "[E]mployer[s] need only provide *some* reasonable accommodation." *See Romanello,* 2002 U.S. Dist. LEXIS 18538, at *28 (internal quotation marks and citation omitted) (emphasis in original).  Defendant has satisfied its obligation under the NYSEL and NYCHRL.

Because defendant did not refuse or fail to reasonably accommodation plaintiff, plaintiff's reasonable accommodation claims under the NYSEL and NYCHRL must be dismissed as a matter of law.  Accordingly, defendant's motion for summary judgment as to plaintiff's reasonable accommodation claims is granted.

**F. Retaliation Claim**

Under the NYSEL and NYCHRL it is unlawful to retaliate against an employee because she "opposed statutorily-forbidden discriminatory practices." *See Ruane-Wilkens v. Board of Educ. of City of New York*, 56 A.D.3d 648, 649 (2d Dep't 2008); NYSEL § 296(7); NYCHRL, Admin. Code § 8-107(7).  To establish a *prima face* case of retaliation, a plaintiff must demonstrate that (1)

43

participation in a protected activity known to the defendant, (2) an employment action disadvantaging the plaintiff,[8] and (3) a causal connection between the protected activity and the adverse employment action that raises an inference of retaliation. *See Forrest*, 3 N.Y.3d at 313; *Thide v. New York State Dep't of Transp.*, 27 A.D.3d 452, 454 (2d Dep't 2006).

The parties do not dispute that plaintiff has satisfied the first two elements of a *prima facie* retaliation claim. Specifically, it is undisputed that plaintiff's request for accommodation was a protected activity known to defendant and that her termination constitutes an adverse employment action.

As to the third element, causation, temporal proximity between a plaintiff's exercise of rights under the NYSEL and NYCHRL to seek a reasonable accommodation and an adverse employment action can give rise to an inference of retaliation. *See Ragusa v. Malverne Union Free Sch. Dist.*, 582 F. Supp. 2d 326, 348 (E.D.N.Y. 2008) (citations omitted). While there is no bright line "'to define the outer limits beyond which a temporal

---

[8] The second element under the NYCHRL requires the plaintiff to demonstrate the action "complained of must be reasonably likely to deter a person from engaging in protected activity." *See* NYCHRL, Admin. Code § 8-107(7). Because plaintiff claims that she was terminated in retaliation for her request for accommodation, any difference in the requirements of the NYSEL and NYCHRL are immaterial for purposes of the court's analysis.

relationship is too attenuated to establish a causal relationship,' district courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *See Garrett v. Garden City Hotel, Inc.*, No. 05-CV-962, 2007 U.S. Dist. LEXIS 31106, at *69-70 (E.D.N.Y. Apr. 19, 2007) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001)) (collecting cases).

Here, plaintiff requested a schedule change in mid-March 2007 (Def. ¶ 30) and was terminated on May 22, 2007 (id. ¶ 64). Because less than two months passed between plaintiff's accommodation request and her termination, the court concludes that plaintiff has satisfied the causal nexus requirement. Accordingly, plaintiff has established a *prima facie* case of retaliation.

Once plaintiff establishes a *prima facie* retaliation case, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Kemp v. Metro-North R.R.*, No. 04-CV-9926, 2007 U.S. Dist. LEXIS 43568, at *44-45 (S.D.N.Y. June 14, 2007); *see Forrest*, 3 N.Y.3d at 313. The burden then shifts back to the plaintiff to prove that the articulated reason is a pretext and the "real reason" for the adverse action was

plaintiff's protected activity. *Kemp*, 2007 U.S. Dist. LEXIS 43568, at *44-45.

As previously discussed, defendant has clearly articulated a legitimate, non-discriminatory reason for plaintiff's termination, namely, her "apparent structuring of transactions and her inadequate explanation for doing so." (*See* Perez Aff. ¶ 25; Def. 56.1 Stmt. ¶ 62; Pl. 56.1 Stmt. ¶ 62.) Even though plaintiff has presented sufficient evidence to establish a *prima facie* retaliation case, as with her disparate treatment claims, plaintiff has failed to demonstrate that defendant's stated legitimate, non-discriminatory reason for her termination was pretextual. Nor is there any evidence to indicate that unlawful retaliation was the "real reason" for plaintiff's termination. *See Kemp*, 2007 U.S. Dist. LEXIS 43568, at *54 (quoting *Weinstock*, 224 F.3d at 42).

Furthermore, "mere temporal proximity" is insufficient to support a claim of retaliation at the summary judgment stage. *See Murray v. Visiting Nurse Servs. of New York*, 528 F. Supp. 2d 257, 277 n.14 (S.D.N.Y. 2007) (citations omitted). Given that plaintiff has failed to carry her ultimate burden to raise a triable issue of fact as to her retaliation claim, or otherwise offer any evidence from which a reasonable jury could infer that defendant's proffered reason was a pretext and that plaintiff's termination was the product of a retaliatory motive, summary

judgment in defendant's favor is warranted.  Accordingly, plaintiff's retaliation claims are dismissed.

## **CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment is granted in its entirety.  The Clerk of the Court is respectfully requested to enter judgment in defendant's favor and close this case.

SO ORDERED.

Dated: Brooklyn, New York
       March 22, 2010

                                        _____/s/_____
                                        KIYO A. MATSUMOTO
                                        United States District Judge
                                        Eastern District of New York